**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHELDON STEIN, CHAPTER 7 TRUSTEE FOR THE BANKRUPTCY ESTATE OF YAZMIN TORRES-DUQUM, | ) | CASE NO. 1:20-CV-00998 |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| v. | ) | **MEMORANDUM, OPINION & ORDER** |
| UNIVERSITY HOSPITALS CLEVELAND MEDICAL CENTER, *et seq.*, | ) | |
| Defendants. | ) | |

## I. INTRODUCTION

This case is before the Court on remand from the Sixth Circuit Court of Appeals. The Circuit reversed a portion of the Court's Order granting summary judgment on Plaintiff's disability discrimination claim. (R. 71). The primary issue now before the Court is whether Defendant University Hospitals Cleveland Medical Center ("UH") failed to reasonably accommodate its employee, Yazmin Torres-Duqum ("Torres").[1] (*Id.*). Germane issues surrounding this question are: (1) whether Torres qualifies as disabled under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.* – specifically was she substantially limited in one or more major life activities; (2) whether seeking a job transfer was a reasonable accommodation request; and (3) whether transfer would have created an undue hardship for UH.

Finding genuine material factual issues as to each of these questions, the Court declines to grant summary judgment for Defendant, as explained herein.

---

1 The Court of Appeals upheld summary judgment on Plaintiff's retaliation claim.

## II. PROCEDURAL HISTORY

Because Torres filed for bankruptcy in 2018, the bankruptcy Trustee[2] ("Plaintiff"), stepping into Torres's shoes, filed suit against UH for disability discrimination and retaliation under the ADA and Ohio Rev. Code Chapter 4112.[3] The parties cross-moved for summary judgment. Plaintiff sought partial summary judgment on Count II – the ADA failure to accommodate claim. (R. 44). UH sought summary judgment on both the federal disability and retaliation claims – Counts II and IV. (R. 45). After full briefing on both motions, (R. 49; R. 50; R. 53; R. 54), the Court granted summary judgment for UH on both Counts, denied Plaintiff's Motion, and dismissed the case. (R. 62). Plaintiff appealed. (R. 66). The Sixth Circuit found the District Court erred by limiting its analysis to whether Torres was substantially limited in the major life activity of working. (*See* R. 62, PageID 1639-41). The Circuit remanded the case for further proceedings, consistent with its opinion. *See Simon, Tr. for Est. of Torres-Duqum v. Univ. Hosps. Cleveland Med. Ctr.,* No. 24-3379, 2025 WL 66756, at *4 (6th Cir. Jan. 10, 2025).

Upon motion, (R. 76), the Court allowed supplemental briefing. (R. 80). UH filed a supplemental Motion for Summary Judgment. (R. 81). Plaintiff filed an Opposition, and UH filed a Reply. (R. 82; R. 83). As outlined below, the Court denies Defendant's Motion.

## III. FACTS

UH first hired Torres as a Physical Therapist in May 2011. (R. 43-1, PageID 910; R. 44-1, PageID 1078). She transferred from UH's Bolwell facility in December 2014 to the Sports Medicine Mandel Jewish Community Center ("JCC"). (R. 81, PageID 1732; R. 82, PageID 1882;

---

2 The case was originally filed by bankruptcy Trustee Richard A. Baumgart. (R. 1). On September 13, 2021, the Court approved a Notice of Substitution, (R. 24), substituting Sheldon Stein for Baumgart. (R. 26). On appeal, the Sixth Circuit granted Plaintiff's Motion to substitute Trustee David O. Simon for Sheldon Stein. (R. 69).

3 In September 2021, Plaintiff stipulated to dismissal of the state-law claims (Counts I and III). (R. 25).

R. 43-1 at 911, Ex.5; R. 44-1 at 1078). She worked at that facility until February 10, 2016, when she took a medical leave of absence due to events giving rise to this lawsuit. (*Id.*).

On that day,[4] Torres suffered a miscarriage, which triggered pre-existing mental health conditions. (R. 82 at 1882-83; R. 43-1 at 939-42; R. 44-1 at 1078; R. 44-8, PageID 1200-01). These conditions relate back to 2006 when Torres gave birth to a stillborn baby. (R. 82 at 1882-83; R. 43-1 at 941; R. 44-8 at 1199-1202). The trauma she experienced then resulted in medical diagnoses of post-traumatic stress disorder ("PTSD"), anxiety, and depression. (R. 43-1 at 939-41; R. 44-1 at 1078). Torres did not immediately report the miscarriage to management. (R. 81 at 1733; R. 42-1, PageID 788; R. 43-1 at 947, 66-67, 69, Ex.3). However, she did tell some of her co-workers. (R. 81 at 1733; R. 43-1 at 951-53, Ex. 3). And one of those people informed Torres other UH employees were gossiping about why she was not at work and spreading rumors about her pregnancy and medical history. (R. 43-1 at 947-48, 952-57, Ex. 3; R. 44-1 at 1078). This caused Torres's anxiety and PTSD to worsen. (R. 43-1 at 957; R. 44-1 at 1078).

So the day after she miscarried (February 11, 2016), Torres called her supervisor, Nate Tekavec ("Tekavec"), informing him why she was on leave and explaining her medical history. (R. 81 at 1733; R. 82 at 1883; R. 42-1 at 757-58, 792, 796-97; R. 43-1 at 947-948, 958-59; R. 44-1 at 1078; R. 44-8 at 1204-08, 1210). Torres asked Tekavec if she could transfer to a different work location for her "physical, mental, and emotional wellbeing as [the rumors about her miscarriage and medical history] further compounded [her] anxiety [and] PTSD…." (R. 81 at 1733; R. 43-1 at 947-48, 950, 960, 964-66; R. 44-1 at 1078-79).

Tekavec informed his boss, Mark Cubbison, about Torres's request, but he did not tell Cubbison it was medically related, nor did he immediately notify HR of any accommodation

---

4 Defendant references the day as February 10, <u>2022</u>, which is a typographical error. (*See* R. 81, PageID 1733).

request.[5] (R. 42-1 at 758, 795-98; R. 44-1 at 1078). He told Torres if she wanted to look for a new position, they would grant that transfer. (R. 42-1 at 759).[6]

Torres texted Tekavec on February 16, 2016, objecting to disclosure of her information to co-workers and again asking for a transfer. (R. 42-1 at 827; R. 44-8 at 1078). Torres was upset with Tekavec because "he was not stopping the rumors and stuff from happening." (R. 81 at 1734; R. 43-1 at 959-60, 964-65; R. 44-8 at 1207-10). That same day, she applied for a position at another UH facility. (R. 44-8 at 1078). Torres testified, "I told Nate that I had applied for a different location because of the current situation, and I needed to remove myself from this, as dealing with this was spiraling my anxiety and PTSD out of control…."[7] (R. 81 at 1734; R. 83, PageID 1906; R. 43-1 at 958; R. 44-1 at 1078-79).

Torres also requested leave under the Family and Medical Leave Act ("FMLA"), which UH approved. (R. 44-1 at 1078). Initially, her therapist believed that with proper treatment, Torres could return to work by March 10, 2016. (R. 39-1, PageID 283-84, Ex. 11,14, 16; R. 43-1 at 959). However, at the thought of returning to the JCC, Torres continued to experience panic attacks, which rendered her unable to sleep, unable to work and unable to care for herself or her

---

5 When an employee informs his/her supervisor of a needed change in work conditions because of a health condition, per UH policy, the supervisor should report the matter to Human Resources, and a designated representative will contact the employee to discuss the request and provide accommodation form(s). (R. 39-1, PageID 288-89; R. 40-1, PageID 444-46).

6 Tekavec testified UH had a transfer portal, and if the applicant's supervisor approved, the employee could transfer, subject to interview and approval by the new location manager. (R. 42-1 at 760-61). He concedes, "[w]e would choose one of the UH people most of the time." (*Id.*)

7 According to Tekavec, Torres expressed that she could no longer work at the JCC location and needed to be transferred because of "the gossip," "the people," and "the environment in the JCC." (R. 83, PageID 1097; R. 42-1, PageID 759, 794). Considering this testimony, the Court finds an issue of fact over Torres's expressed reasons. Regardless, Torres's healthcare provider certified in writing that Torres needed a transfer as an accommodation for a disability, so what Tekavec could or could not recall about their conversations is not dispositive.

children, so she remained on leave. (R. 82 at 1883; R. 39-1 at 279-80; R. 40-1, PageID 472; R. 43-1 at 941; R. 44-1 at 1078; R. 44-6, PageID 1179-81).

On February 25, 2016, Torres's therapist certified that Torres was suffering from PTSD and was participating in weekly therapy appointments.[8] (R. 39-1 at 276-80, Ex. 7). The next day, Torres participated in a phone call with Tekavec, Cubbison, and Dave Amato, an Employee Relations Specialist, concerning her situation. (R. 40-1 at 427; R. 42-1 at 812; R. 44-1 at 1079). Torres asserts during this conversation, her manager asked her to resign if she could not return to work, and that Amato violated her ADA rights. (R. 40-1 at 427; R. 44-1 at 1079).

Torres's FMLA leave was extended through June. While out, Torres spoke to Valerie Jaggie, an Assistant Manager in Human Resources, on May 4th, advising she had been seeking an accommodation since February, and HR "dropped the ball." (R. 39-1 at 297, 446-47, Ex. 11, 14, 16, 20; R. 40-1 at 480-83, Ex. 2). Jaggie initiated the process, sending Torres ADA forms. (*Id.* at 481-82). In the meantime, Torres continued to apply for open positions at other UH sites. (R. 44-1 at 1078-79).

On May 13, 2016, Lisa Edgehouse, Defendant's FMLA/ADA Coordinator, informed Jaggie and Amato about Torres's leave situation and confirmed Torres had received the ADA paperwork Jaggie sent. (R. 82 at 1884; R. 39-1 at 249-50, 297-302, 318, 325, Ex. 12; R. 40-1 at 422, 482, 485-86, Ex. 4; R. 42-1 at 83). As UH requested, Torres provided the ADA questionnaire to her healthcare provider, who certified that Torres is disabled, that she could return to work but not at the JCC, and Torres needed a reassigned work location as an accommodation. (R. 39-1 at 322-24, Ex. 16; R. 43-1 at 973-77; R. 44-1 at 1079). Torres returned the paperwork to UH in early June. (R. 39-1 at 327-30, 333, 337-37, 346-47, Ex. 17, Ex. 20, Ex.

8 Over the following months, Torres managed her anxiety and depression with therapy and medications. (R. 43-1, PageID 941-42).

32). Thereafter, Edgehouse contacted Jaggie and Tekavec, advising them that Torres's healthcare provider recommended a transfer as a disability accommodation. (R. 39-1 at 335-36, Ex. 19; R. 40-1 at 487-88, Ex. 5; R. 42-1 at 832-33, Ex. 3). UH denied this request on June 29, 2016. Jaggie informed Torres:

> After a careful review of your provider's request and the essential functions of your position as noted above, we have determined that we are unable to provide you with a reasonable accommodation at this time because there is no specific accommodation per the provider and no indication that you cannot perform the essential functions of your job at current work assignment.

(R. 39-1 at 339-42, Ex. 25, 26; R. 40-1 at 511-14, Ex. 7, Ex. 8; R. 44-1 at 1079). Jaggie provided two options: Torres could return to work at JCC or remain on unpaid leave while seeking other positions. (R. 82 at 1884-85; R. 39-1 at 252; R. 43-1 at 974, 987; R. 44-4, PageID 1100; R. 44-6 at 1160-61, 1173-77, 1182-86, 1189).

Torres's approved leave ended July 1, 2016. (R. 43-1 at 85). When Torres still had not returned to work on July 15, 2016, Tekavec informed her she would be terminated "due to job abandonment," if she did not "submit paperwork [by July 25, 2016]. . . that would support [her] continued absence from work…." (R. 43-1 at 978-79, Ex. 6; R. 44-1 at 1079; R. 50-4, PageID 1372). Torres responded on July 19, 2016, by texting Tekavec and Cubbison, accusing UH of failing to accommodate her and declaring she would be consulting an attorney (R. 42-1 at 834-339, Ex. 2). She also texted Edgehouse, stating "I have informed both Nate and Marc that I can not [sic] return to that work place due to my medical condition(s)/disabilities." (R. 39-1 at 344-45, Ex. 30; R. 44-1 at 1079). This prompted Jaggie to respond on July 26th, reminding "[her] ADA request to be transferred to another position was denied," and advising if she did not return to work by August 1, 2016, she would be terminated. (R. 40-1 at 525; R. 43-1 at 979, Ex. 7; R. 44-1 at 1079). As a follow up to that letter, on August 11, 2016, Tekavec sent Torres, who had apparently been on extended medical leave, a letter informing her that because she had no FMLA

leave remaining, he could replace her. (R. 50-4, PageID 1374). He further advised she could remain "in medical leave status" for up to 40 weeks, but at the expiration she may be placed "off roll" if she had not secured another position by then. (*Id.*; R. 39-1 at 351-53, Ex. 33; R. 42-1 at 841, Ex. 4; R. 44-1 at 1079-80).

After applying for more than twenty open positions for which she asserts she was qualified,[9] but did not receive, (R. 82 at 1886; R. 43-1 at 990-91; R. 44-1 at 1080; R. 44-5, PageID 1134-35, 1138), Torres was eventually offered a "PRN" (as needed) position at St. John's Medical Center. (R. 43-1 at 912-13, 991-94; R. 44-2, PageID 1081). Torres asserts she attended orientation for this job, but UH never gave her hours. (*Id.*). So in August 2017, Torres secured another part-time position at the Warrensville Heights office. (R. 43-1 at 913-15, 1006, 1013). She eventually left that position in December 2017, when she secured a full-time position with an external employer, leaving because she did not get full-time hours. (*Id.*).

## IV. LAW & ANALYSIS

### A. Whether Torres qualifies as disabled – was she substantially limited in one or more major life activities?

The ADA prohibits employers from failing to grant reasonable accommodations to *disabled* employees. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (emphasis added) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)); *see also* 42 U.S.C. §§ 12112(a); 12112(b)(5). The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Impairments include "any mental or psychological disorder, such as…emotional or mental illness." 29 C.F.R. § 1630.2(h)(2).

9 Torres testified outside of the JCC she could perform all the duties of a Senior Physical Therapist. (R. 43-1, PageID 974-76. Ex. 5). Upon trying to return to the JCC, she had multiple panic and anxiety attacks. (*Id.* at 975-77).

Plaintiff asserts "[t]he Sixth Circuit determined that the evidence in this case is sufficient to prove Torres is disabled." (R. 82, PageID 1888). *See Estate of Torres-Duqum,* 2025 WL 66756, *3). Torres suffers from mental disorders, but the Circuit did not directly rule Torres qualified as disabled. Instead, the Circuit reversed, because the prior decision "limit[ed] its analysis to the major life activity of working." *Estate of Torres-Duqum,* 2025 WL 66756, at *1. (R. 71, PageID 1706). Thereafter, the parties provided further briefing, which the Court anticipated would address this specific issue. However, because neither clearly did so, the Court's performs its own analysis, based on the facts in the record.

To establish a *prima facie* failure to accommodate case, Plaintiff must demonstrate: (1) Torres is disabled; (2) she was otherwise qualified for the position, with or without accommodation; (3) UH knew or had reason to know of her disability; (4) she requested an accommodation; and (5) UH failed to provide a necessary accommodation. *Coles v. Johnny Appleseed Broad. Co.,* 479 F. Supp. 3d 585, 597 (N.D. Ohio 2020) (Barker, J.) (citing *Myers v. Cuyahoga Cty.,* 182 F. App'x 510, 515 (6th Cir. 2006)).

Initially, the Court ruled Plaintiff did not raise a genuine dispute of material fact as to whether Torres qualified as "disabled" because Plaintiff did not show Torres was "unable to work a broad range of jobs," and ended its analysis there. (*See* R. 62, PageID 1640). But "major life activities" are much more comprehensive and include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, [and] interacting with others, [as well as] working." 29 C.F.R. § 1630.2(i)(1)(i); 42 U.S.C. § 12102(2)(A).[10]

Under its analysis, the Court construes the definition of disability broadly. *See* 42 U.S.C.

---

10 The 2008 Amendments to the ADA ("ADAAA") revised this definition to include "major bodily functions, "including, but not limited to … digestive, … neurological, brain, respiratory ,… and reproductive functions. 42 U.S.C. § 12102(2)(B); 29 C.F.R. §1630.2(i)(1)(ii).

§ 12102(4)(A); 29 C.F.R. § 1630.2(g)(1). The term "major" "shall not be interpreted to strictly create a demanding standard." § 1630.2(i)(2). Similarly, "substantially limits," must also "be construed broadly in favor of expansive coverage." *See* §1630.2(j)(1)(i). Under this broad standard, even transitory or minor impairments lasting fewer than six months can be "substantially limiting." § 1630.2(j)(1)(ix). And an episodic impairment – such as PTSD – constitutes a disability "if it would substantially limit a major life activity when active." § 12102(4)(D); § 1630.2(j)(vii).

PTSD, anxiety, and depression can be qualifying disabilities under the ADA. *See, e.g., Hostettler v. Coll. of Wooster*, 895 F.3d 850, 853-54 6th Cir. 2018); *Tomlinson v. Krauss-Maffei Corp.*, No. 2:19-CV-69, 2021 WL 5830017, at *4 (E.D. Ky. Dec. 8, 2021). For example, in *Hostettler*, the plaintiff testified if she worked later than noon, her modified stop time, she would have panic attacks during which she had difficulty breathing, thinking, and walking. But under an accommodated schedule, she could perform her required human resource duties. The court found because the plaintiff "was substantially limited in her ability to care for herself, sleep, walk, or speak," while experiencing depression and anxiety, "the episodic nature of her panic attacks did not preclude a finding that she was disabled." 895 F.3d at 853-54.

Additionally, in *Smith v. Bryce Corp.,* No. 20-2828, 2023 WL 3168344, *3-4 (W.D. Tenn. Apr. 28, 2023), the plaintiff, like Torres, suffered from PTSD, anxiety, and depression. She testified that her condition affected the major life activities of sleeping, working, and performing manual tasks. This was confirmed by her behavior health specialist. As an accommodation, she sought transfer to the day shift, but learned upon her return to work, she would again be scheduled to work nights. In rejecting summary judgment, the court found a genuine issue of material fact as to whether Smith's PTSD substantially limited the major life activity of sleeping:

> Taking into account the ADAAA's mandate of broad coverage, the EEOC guidelines' strong presumption that Smith's PTSD 'substantially affected a wide

> range of major life activities as compared to persons not suffering from that impairment,' and the majority of courts that have found varying levels of sleeplessness to constitute substantial impairments, the undersigned finds … sufficient facts to create a genuine issue as to whether she was disabled.

*Id.,* at *10-11 (citing *Williams v. AT&T Mob. Servs., LLC,* 186 F. Supp.3d 816, 825 (W.D. Tenn. 2016) (granting summary judgment for plaintiff where medical evidence established plaintiff's depression substantially limited major life activity of sleeping)).

Plaintiff need only show Torres was substantially limited in one major life activity to meet the disability element. 42 U.S.C. § 12102(3). In this case, Plaintiff asserts, "PTSD is an episodic condition that manifests in panic attacks that substantially limit Torres' major life activities of 'working, thinking, concentrating, caring for [her]self, and interacting with others.'" (R. 82, PageID 1882-83) (citing R. 44-1, PageID 1078). And in examining the Complaint, Plaintiff alleges Torres's PTSD and depression "substantially limit … major life activities, including … working, interacting with others, concentrating, thinking, caring for herself and her children, sleeping, eating[,] and performing routine daily tasks." (R. 1, PageID 4, ¶18.) Torres further attested that when her condition "flares up," her major life activities of "working, thinking, concentrating, caring for [herself], and interacting with others" are substantially limited. (R. 44-1, PageID 1078.) She recounted that, following her miscarriage, she could not sleep, function, or care for her children. (R. 43-1, PageID 941.) And Torres's healthcare provider confirmed this by certifying the disability "limits [Torres's] focus," and Torres needs to be able to think clearly to do her job. (R. 44-6, PageID 1182-83, 1186, 1189).

Examining these assertions, "[t]he many district courts that have decided the issue have found that a broad range of sleep problems qualify as substantial impairments under the ADAAA." *Smith*, 2023 WL 3168344, at *10 (citing *Garibay v. Hamilton County, Tennessee,* 496 F. Supp. 3d 1140, 1142, 1147 (E.D. Tenn. 2020) (plaintiff's PTSD that led to difficulty sleeping created a genuine issue of material fact as to whether he was disabled)); *Dye v. Thomas More*

*University, Inc.*, No. 2:19-CV-087, 2021 WL 4006123, at *8 (E.D. Ky. Sept. 2, 2021) (plaintiff, who was diagnosed with depression, generalized anxiety disorder, and PTSD, and experienced insomnia as a result, raised a genuine dispute as to whether she was substantially limited); *Wanner v. Under Armour, Inc*., No. 3:18-CV-00767, 2020 WL 7489464, at *1 (M.D. Tenn. Dec. 21, 2020) (a reasonable jury could find that plaintiff, who was diagnosed with adjustment disorder and suffered from insomnia, was disabled); *Reeder v. Cnty. of Wayne,* 177 F. Supp. 3d 1059, 1077 (E.D. Mich. 2016) (plaintiff, diagnosed with anxiety and suffering from sleeplessness, presented sufficient facts to survive summary judgment).

Plaintiff also alleges substantial impairments in thinking and concentration, which are also major life activities. *See Salim v. MGM Grand Detroit, L.L.C.,* 106 F. App'x 454, 459 (6th Cir. 2004) (citing *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 307 (3d Cir. 1999)); *Verhoff v. Time Warner Cable, Inc.,* 299 Fed. Appx. 488, 493 (6th Cir. 2008) ("[I]t seems a bit bizarre to flatly say that thinking – the very activity that makes us human is not 'major' enough."); *Shaver v. Wolske & Blue,* 138 Ohio App. 3d 653, 667 (Ohio Ct. App. 2000) (holding thinking is a major life activity under Ohio Rev. Code. § 4112.02(A) (citing *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)).

As noted by the Sixth Circuit, UH "did not refute these allegations," instead arguing Torres sought transfer to another location due to a "personality conflict," and therefore is not disabled. *Simon,* 2025 WL 66756, at *4. UH continues to stand on this as its defense. (R. 81, PageID 1731-32, 1741-42; R. 83, PageID 1906-09). But this is exactly an argument reviewed – and rejected – by the Circuit:

> True, mere personality conflicts and similar workplace stress issues are not, on their own, substantial limitations on the major life activity of *working.* But as discussed above, the district court erred by not analyzing the asserted limitations on Torres's major life activities other than working. Moreover, Torres testified that the building itself, not just specific coworkers, triggered debilitating anxiety. This argument therefore does not change our analysis.

*Simon,* 2025 WL 66756, at *4 (citations omitted).

The Court finds genuine issues of material fact exist regarding Torres's conditions of PTSD, anxiety, and depression as a trier of fact may reasonably determine that such conditions substantially limited her major life activities, such as thinking, concentrating, and sleeping.

**B. Whether Torres's request for accommodation was reasonable?**

In its original analysis, the Court found no reason to delve into Defendant's arguments that even if Torres has a qualifying disability, summary judgment was appropriate because her requested accommodation was unreasonable and would cause undue hardship to UH. The Court now considers Defendant's arguments and finds material issues of fact preclude a finding the transfer request was unreasonable.

Employers, like UH, are mandated to engage in the "interactive process" with disabled employees seeking an accommodation of a disability. *Deister v. AAA Auto Club of Michigan,* 91 F. Supp. 3d 905, 928 (E.D. Mich. 2015), *aff'd sub nom., Deister v. Auto Club Ins. Ass'n,* 647 F. App'x 652 (6th Cir. 2016). But the plaintiff "bears the initial burden of … showing that that accommodation is objectively reasonable." *Kleiber,* 485 F.3d at 870 (quotation omitted). Here, Edgehouse received information from Torres's provider, and reported it to HR and Torres's supervisors, relaying the asserted disability and accommodation request. She wrote: "[t]he provider is concerned that her serious health condition may impact her concentration and supervision of patients." (R. 44-6, PageID 1190-91; *see also* R. 39-1, Ex. 19). Yet, other than informing Torres she was welcome to apply for other positions, UH simply denied the request on June 29, 2016. (R. 81, PageID 1736; R. 39-1, PageID 339-42, Ex. 25, Ex. 26).

UH deemed Torres's request unreasonable, asserting "there was no specific accommodation identified by Torres' medical provider and no indication that Torres could not perform the essential functions of her position at her current job assignment." (R. 81 at 1736; R.

39-1, PageID 339-42, Ex. 25, 26; R. 40-1, PageID 511-14, Ex. 7, Ex. 8; R. 44-1, PageID 1079). However, Edgehouse and Jaggie testified that statement was not correct, as they acknowledged Torres's provider made a specific accommodation request that included a change of work location and flexibility, and also asserted that Torres could not perform the essential functions of her job while at the JCC. (R. 39-1 at 342-44; R. 40-1 at 514-17).

UH alternatively argues it accommodated Torres by providing an extended leave of absence and by evaluating her request and accompanying documentation, as well as by speaking with her medical provider. (R. 83, PageID 1909-10; R. 39-1 at 252-53; R. 40-1 at 427, 472-74, 517-18). Analyzing one's ability to perform essential job functions does not amount to providing accommodations. It quintessentially amounts to the employer's determination of whether an employee is actually disabled. Furthermore, providing extended leave does not automatically render such accommodation reasonable, as UH would suggest. (R. 81, PageID 1737-38). *See, e.g., Lafata v. Church of Christ Home for the Aged,* 325 F. App'x 416, 423 (6th Cir. 2009) (finding issue of material fact as to whether Defendant demonstrated good faith in the mandatory interactive process by informing Plaintiff she could "take [ ] or leave" a nursing position without accommodations, despite affording Plaintiff extensive FMLA leave).

Turning to Torres's specific request, courts within the Sixth Circuit have consistently held employers "have a duty to locate a suitable position when a plaintiff's requested accommodation is a job transfer." *Arndt v. Ford Motor Co.*, 247 F. Supp. 3d 832, 856–57 (E.D. Mich.), *aff'd,* 716 F. App'x 519 (6th Cir. 2017) (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014)); *see also Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 258 (6th Cir. 2000) ("Where a requested accommodation is a job transfer, 'employers have a duty to locate suitable positions for' employees with disabilities."); *Deister,* 91 F. Supp. 3d at 929 (same). Thus, a job transfer can certainly qualify as a reasonable accommodation.

In such situations, the plaintiff must generally identify the specific job sought and demonstrate she is qualified. *Kleiber*, 485 F.3d at 870; *see also Burdett–Foster v. Blue Cross Blue Shield of Michigan*, 574 Fed. Appx. 672, 680 (6th Cir. 2014). Torres identified (and applied) for over twenty jobs. (R. 82 at 1886; R. 44-1 at1080). And she demonstrated she was qualified, (*see, e.g.,* R. 42-1, PageID 791-92). Finally, the Court acknowledges Defendant's argument that an employer must only transfer or reassign an employee to a *vacant* position. *Cooper v. Dolgencorp, LLC,* 93 F.4th 360, 372 (6th Cir. 2024); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). And here Torres applied for multiple *vacant* positions.

Whether transferring Torres would have enabled her to perform the essential job functions of a Physical Therapist remains unanswered because UH did not offer her one. Thus, the Court finds genuine issues of material fact preclude judgment for Defendant on the issue of whether a job transfer was an unreasonable accommodation.

**C. Whether allowing a transfer would have caused UH an undue hardship?**

If the plaintiff shows the requested accommodation is reasonable, the burden shifts to the employer to show that the accommodation would cause undue hardship. *King v. Steward Trumbull Mem'l Hosp., Inc.,* 30 F.4th 551, 560 (6th Cir. 2022); *Johnson v. Cleveland City School District,* 443 Fed. Appx. 974, 983 (6th Cir. 2011). In support of a hardship argument, UH asserts its policies do not provide for automatic transfers. (R. 83, PageID 1910-13). "[A]ll employees, regardless of alleged disability status, apply for positions through the University Hospitals standard application and transfer process."[11] (*Id.* at 1913; R. 41-1, PageID 604-06; R. 45-1, PageID 1248). UH argues there must be an open position, and the employee must be qualified.

---

11 Jaggie testified UH denied the request because UH had never reassigned anyone as a disability accommodation. (R. 40-1 at 472, 476). "It is just not UH's practice to transfer employees." (R. 40-1 at 450. 492).

(R. 81, PageID 1737; R. 41-1, PageID 604-06, 662-64; R. 45-1 at 1247-49).

However, based on the record, UH had sufficient locations with multiple openings. And UH Recruiter, Christine Middleton, testified Torres was qualified for several of the jobs to which she applied, and she knew of no reason UH could not have transferred her. (R. 41-1, PageID 622, 648, 663, 669, 673-74). Similarly, UH's ADA Coordinator, Edgewater, admitted she knew of no hardship UH would have experienced if it had transferred Torres. (R. 39-1, PageID 332, 340, 350, 356; R. 44-6 Page ID 1162). Yet it is undisputed UH did not transfer Torres. (R. 44-1, PageID 1080; R. 44-5, PageID 1134-38).

Jaggie elaborated, if an accommodation "would have a negative effect on the business," or "affect others or the department," UH would not approve the request. (R. 83, PageID 1912, R. 40-1 at 495-96, 499-501). However, no witness testified that the accommodation Torres sought created such problems. HR Manager Jaggie testified she was unaware of any issues with or misconduct by Torres.[12] (R. 40-1, PageID 425-26). Even Torres's supervisor, Tekavec, testified he could think of no reason UH could not place a qualified Physical Therapist into a different location as an accommodation.[13] (R. 42-1, PageID 823-24).

---

12 UH Recruiter Middlefield testified UH did not select Torres for some positions because she was "not a good fit;" was "rude;" wasn't a "good team fit;" "did not answer questions correctly;" "interviewed poorly;" talked about herself "loudly and obnoxiously;" went into "too much detail about personal matters;" and was late for one interview. (R. 41-1, PageID 597-98, 622-23, 667-68, 681-82; R. 50-9, PageID 1454). But countering this, Plaintiff points to Middleton's admission that prior to Employee Relations Specialist Amato speaking to her about Plaintiff's legal claims and requiring routine updates on Torres's interviews, something not previously requested in other internal transfers, she had never had any negative experiences, nor heard Torres was rude or unprofessional. (*Id.* at 647-48, 657-58; *see also* R. 44-1, PageID 1078-79; R. 44-6, PageID 1165). While not dispositive, there remain issues of material fact for a trier of fact to consider.

13 Tekavec speculates some supervisors may have thought Torres was difficult to work with, but he has no concrete knowledge. He confirmed he never disapproved the request or informed Edgehouse that Torres had issues getting along with others. (R. 42-1, PageID 833-36).

UH correctly asserts an employer is not mandated to "create new jobs, displace existing employees from their positions, or violate other employees' rights…in order to accommodate a disabled individual." *See Burns v. Coca-Cola Enters.*, 222 F.3d 247, 257 (6th Cir. 2000); *see also Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998) (employers do not have to reallocate an essential job function to accommodate an employee). However, no such facts have been presented here. Physical Therapists are not in a union, they have no seniority system or bumping rights. (R. 40-1, PageID 452-53). Further, there is no indication UH would have needed to reallocate any of Torres's essential job functions by accommodating her transfer. Therefore, UH's claims of undue hardship do not support summary judgment. Having failed to meet their burden, the Court finds genuine issues of material fact remain for a trier of fact to consider.

## V. CONCLUSION

"The ultimate question [is] whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving part[y] should prevail as a matter of law." *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). The parties were afforded an opportunity to address the issues raised by the Circuit for the Court, particularly whether Torres is substantially limited in one or more major life activities – other than working. Having found that issues of material fact exist on this issue, as well as on the issues of whether Torres's sought accommodation was reasonable or created some undue hardship, the Court denies Defendant's Supplemental Motion for Summary Judgment, (R. 81).

IT IS SO ORDERED.

Date: September 30, 2026

s/ *David A. Ruiz*
David A. Ruiz
United States District Judge